## Blaylock's Appeal.

1. B. was a special partner in the firm of H. & S. who owned the real estate, which was about to be sold by the sheriff, it was agreed that if B. would buy the property at sheriff's sale, S. would procure D. a lien-holder to accept from B. a mortgage on the property for his debt and if B. should sell at an advance he would apply the excess to the payment of the firm debts and would divide any further excess with S. Z. purchased for B. for enough to pay D's lien and costs, which were paid in cash : the deed was made to Z. *Held*, that the property was in trust for the purposes of the agreement, and, the firm debts having been paid, Z. was ordered to convey to B. for the trust.

2. The income until the sale was to be applied to reimburse B. for the purchase-money : and when sold B. to account for the rents.

3. S. was not entitled to a conveyance of the moiety subject to B.'s advance ; but B. was enjoined from selling at private sale without the consent of S. or at public sale without notice to S.

February 3d 1874. Before READ, C. J., SHARSWOOD, WILLIAMS and MERCUR, JJ. AGNEW, J., at Nisi Prius.

Appeal from the decree at Nisi Prius : No. 350, to July Term 1869 : In Equity.

On the 20th of July 1869, Henry Samuel filed a bill against Lewis Blaylock, George W. Zeigler and D. P. Cubberly. The bill set out :—

1. A limited partnership for manufacturing hats had been formed January 1st 1867, in which Samuel (plaintiff) and P. Herst were general partners, and Blaylock (defendant) special partner.

2. Plaintiff and Herst owned a lot of ground on Cherry street, &c., Philadelphia, on which were a factory and warerooms, where the firm of Herst & Samuel transacted their business.

3. In the winter of 1868–1869 the firm became embarrassed ; several judgments had been recovered against them ;—one in favor of David Samuel, for $10,250 ; another in favor of Eli Keen, for $1705.03 ;—under the second judgment the property had been taken in execution and was advertised to be sold by the sheriff on the 3d of May 1869.

4. The property being worth more than the liens against it, the plaintiff and Herst were desirous of saving it for the benefit of their creditors, and, if possible, for the firm after the payment of their debts; in this, before the sale, Blaylock appeared to acquiesce, and proposed to the plaintiff and Herst to buy the property at sheriff's sale to effect those purposes; in consequence, Blaylock, Herst, the plaintiff with his counsel and the counsel of the execution-creditor, met a few days before May 3d 1869, when it was agreed between Blaylock, Herst and the plaintiff, that if the property should bring at sheriff's sale no more than enough to cover David Samuel's lien and the expenses of the sheriff's sale, Blaylock would buy it and hold it for the benefit of the creditors of the firm of Herst & Samuel, and after the payment of the firm debts, then for the benefit of plaintiff and Blaylock. To enable Blaylock to do this, David Samuel agreed that if Blaylock should become the purchaser, he (Samuel) would receive for his debt a new lien on the property from the purchaser; the agreement between the plaintiff, Herst and Blaylock was reduced to writing and signed by Blaylock.

5. Blaylock, in violation of his agreement and in fraud of the plaintiff, colluded and conspired with Zeigler to buy the property at sheriff's sale for $10,800—just enough to pay David Samuel's lien and the expenses of sale; the premises were in fact bought by Blaylock, he furnishing the money, and Zeigler was merely his instrument, covinously allowing his name to be used to assist Blaylock in his fraud on the plaintiff and Herst.

6. The plaintiff, confiding in the good faith of Blaylock and believing that he would carry out the agreement, did not prepare himself to protect his interest at the sale as he could have done.

7. All the debts of the firm of Herst & Samuel had been paid.

8. The property was worth much more than $10,800 and prior encumbrances; and, as plaintiff was informed and believed, Blaylock had entered into an arrangement to sell it to the defendant Cubberly for $40,000, a part of which had been paid by Cubberly, who had gone into possession.

The prayers were that Blaylock and Zeigler be restrained from selling the property and executing a deed to Cubberly; that Cubberly be restrained from purchasing and accepting a conveyance; that Blaylock and Zeigler be declared trustees for the plaintiff and Blaylock in equal shares, subject to the $10,800 and prior encumbrances, and that Blaylock and Zeigler be decreed to convey to the plaintiff an undivided moiety of the property subject to the $10,800 and prior encumbrances; and for further relief.

The agreement named in the proceedings "Exhibit B." and referred to in the bill was:—

"This agreement made between Philip Herst and Henry

[Blaylock's Appeal.]

Samuel of the first part, and Lewis Blaylock of the second part, witnesseth: Whereas, a certain three-story brick factory, &c., have been taken in execution and are to be sold on the 3d day of May 1869, by the sheriff, &c., which said premises are bound by the lien of a judgment in favor of David Samuel for ten thousand dollars, exclusive of interest accrued thereon. And whereas, the said Lewis Blaylock intends to bid at the said sheriff's sale for the said premises: Now the parties of the first part do agree with the party of the second part, that if the party of the second part should become the purchaser of the premises aforesaid at the said sheriff's sale, that they, the parties of the first part, will procure the said David Samuel to accept from the said Lewis Blaylock, his bond, secured by mortgage upon the said premises, for the sum of ten thousand dollars, subject to the prior mortgage and ground-rents now on the said premises, to be made payable in instalments of two thousand dollars a year, in payment of so much of the judgment of the said David Samuel, and that upon the payment of the residue of the said judgment, the parties of the first part will procure the said David Samuel to enter satisfaction of record thereon, provided, &c., the said Lewis Blaylock, shall insure, &c., *and in consideration thereof* the said party of the second part does agree, &c., that if he should become the purchaser of said premises at the said sheriff's sale, and should thereafter at any time, sell the said premises for a greater sum than the price at which the same shall be so purchased by him, and the costs, charges, interest and expenses, suffered or expended by him in relation to the said premises after such purchase, that then he, the party of the second part, will apply such excess or net profit which may arise from such *subsequent sale* of the premises to the payment or settlement of the debts due by the said parties of the first part, as partners, under the firm of P. Herst & Samuel, and that if after such settlement or payment of said debts, any residue of the net profits aforesaid should remain, that such residue shall be equally divided between Henry Samuel, one of the parties of the first part, and him, the said Lewis Blaylock, the party of the second part.

" In witness whereof, the said parties hereto have hereunto set their hands and seals, this the　　　day of　　　A. D. 1869.

　　　　　　　　　　　　　　　　　　　　　[L. S.]
　　　　　　　　　　　　　　　　　　　　　[L. S.]
LEWIS BLAYLOCK,　　　　　　　　　　　[L. S.]"

Blaylock answered admitting the first, second, third and seventh paragraphs of the bill.

4. He denied the fourth and averred, that he agreed if he purchased the property to hold it in trust for the firm, but did not agree to purchase at any price; he signed an agreement not in his possession which would determine his engagement.

5. He denied that he combined with Zeigler or procured him to buy the property; respondent bid $10,600, which was as much as he was satisfied to bid; he did not know, when the property was struck down, that it was purchased by Zeigler; respondent had no interest in the property; he denied that he violated any agreement or contemplated or perpetrated a fraud on the plaintiff.

6. He was ignorant of the allegations of the sixth paragraph.

8. He did not know that Zeigler had agreed to sell the property; neither he nor Cubberly had paid respondent any money; he was informed that Cubberly is in possession.

Zeigler answered that he was ignorant of the averments in paragraphs one, two, three, four, six and seven, of the bill.

5. He denied that he colluded or combined with Blaylock to become purchaser of the property at sheriff's sale; he attended the sale and purchased at his own instance; there was no privity between him and Blaylock; he had no knowledge of the arrangement and agreement mentioned in paragraph five.

8. He was exclusive owner of the property; had leased it to Cubberly for five years, with an option to him to purchase; and being no party to any arrangement between plaintiff and Blaylock, he had been advised it was not material for him to answer further.

Cubberly answered that he had no knowledge of the matters alleged in the bill, except that he was tenant of the property for five years, with an option to purchase which he had not exercised; he had given no money to Blaylock.

A replication was filed, and an examiner appointed.

On the coming in of his report, William M. Smith, Esq., was appointed master.

The master reported amongst other things: * * * "It is shown conclusively by the testimony, that David Samuel had agreed to accept Blaylock's bond and mortgage, had it been tendered him in lieu of the cash, for the amount which was due to him by the firm, and the fact that it was to be a *second* mortgage with ground-rents and another mortgage ahead of it on the property, is, I think, sufficient to prove that David Samuel was perfectly willing to *do anything* to assist the firm out of their difficulties.

" I leave this part of the case therefore with the conclusion that the paper marked 'Exhibit B,' does not accurately and truly set forth the real agreement between these parties, and that even if it did, it presents no such a case as would refer the plaintiff exclusively and entirely to his action at law, and estop him from going into equity for the purpose of restraining the continuation of an alleged fraud upon his rights in the property, which is the subject of this controversy. * * *

" The weight of the evidence is sufficient to satisfy me:

" That the agreement was positive ánd distinct between all the parties that Blaylock should buy the property, and that he *would* buy it for himself and the other members of the firm;

" That Blaylock himself originated the plan and personally proposed and urged it on the other partners, both of whom gave their consent to it, subsequently assisting him and co-operating with him as far as they could in carrying it out;

" That at Blaylock's instance, and without the knowledge of the other partners, an alteration was made in the agreement before the sheriff's sale, whereby Herst was to be excluded from its benefits; an alteration which was binding on Mr. Herst himself, only because he had ample notice of it, acquiesced in it, and never subsequently entered either objection to, or protest against it;

" That Blaylock actually became the purchaser at the sheriff's sale, furnishing all the money, and using the name of George W. Zeigler for the purpose;

" That while there is no positive evidence to show that the defendant Zeigler knew before the sale *all the terms* of the agreement between Blaylock and his partners, there is enough to show that he acted throughout the whole operation as the friend and confidant of Blaylock, that he took the title to the property from the sheriff *for* Mr. Blaylock, that if he yet holds the title, he holds it for Blaylock, and that he has permitted the use of his name in every necessary way since the date of the sheriff's sale for the purpose of giving a bonâ fide appearance to the transaction.

" The witness Herst says that Mr. Blaylock himself suggested that he should become the purchaser of the property; that Blaylock came to him and asked him whether he would not prefer that hs should buy the property and hold it for the benefit of all concerned; that he and Henry Samuel and Blaylock conferred together on the subject, and that finally it was agreed that Blaylock should be permitted to buy without objection or opposition on their part, with the understanding that he should hold the property for the benefit of all the members of the firm, subject nevertheless, only to the claims of bonâ fide creditors. This was the trust, therefore, which was assumed by Blaylock. * * *

" Recurring now to the only remaining, but most important question in the case, whether Blaylock actually did buy this property or not? I think the evidence establishes the fact that he did so buy it; that he used Mr. Zeigler's name for the purpose; that he furnished all the money that was necessary for the operation, and by an arrangement between himself and Zeigler, procured the latter to take the title, in order to give a bonâ fide appearance to the transaction, and to deprive the plaintiff of all interest in the property or in the profits of the resale. * * *

In the opinion of the master, therefore, it should be ordered,

[Blaylock's Appeal.]

adjudged and decreed that Lewis Blaylock holds the real estate described in the bill, to wit:

" ' All that certain lot or piece of ground, with the buildings and improvements thereon erected, situated on the south side of Cherry street, between Third and Fourth streets," &c., in trust for himself, the said Lewis Blaylock, and for the complainant, Henry Samuel, in equal undivided moieties ; subject to the payment to the said Blaylock of the sum of $10,800, with interest thereon from the 8th of May 1869, out of the proceeds of the sale of the same when sold, and subject also to prior encumbrances existing on 8th May 1869, the date of the execution and delivery of the sheriff's deed ; that George W. Zeigler is a trustee for the same without any real interest therein, and that he, the said George W. Zeigler, is hereby ordered and directed to execute a conveyance in fee of the same to the said Lewis Blaylock, who shall hold the same for himself and the complainant, Henry Samuel, in trust as aforesaid.

" That an injunction be granted enjoining and restraining the said Lewis Blaylock and George W. Zeigler severally from conveying or encumbering said premises, and from executing any deed therefor, other than as is herein ordered.

" That said Blaylock be ordered and directed to pay to complainant the one-half of all the rents of said premises heretofore paid by the defendant, D. P. Cubberly, with interest from the date of collection, less the taxes and interest on said prior encumbrance, and that an account be taken thereof. ·

" And that the defendants, Blaylock and Zeigler, pay the costs of these proceedings."

Exceptions were filed to the master's report which, December 30th 1871, were overruled at Nisi Prius (SHARSWOOD, J.), and the decree recommended by the master made.

The cause was then referred to the master to state an account.

He reported an account which with a modification was confirmed by the court at Nisi Prius (AGNEW, J.), March 28th 1872.

The defendants appealed to the Supreme Court in banc ; and in a number of specifications assigned for error the decree made at Nisi Prius December 30th 1871.

*D. W. Sellers* (with whom was *G. W. Dedrick*), for Blaylock, appellant.

*J. Samuel*, for appellee.—Zeigler and Blaylock made themselves trustees *ex maleficio* for complainant. Blaylock having put himself in a relation of confidence with plaintiff, by collusion with Zeigler, he got the premises in such a manner as abused that confidence : Kisler *v.* Kisler, 2 Watts 323 ; Morey *v.* Herrick, 6 Harris 123 ; Hogg *v.* Wilkins, 1 Grant 67 ; Seichrist's Appeal, 16 P. F. Smith 237 ; Seylar *v.* Carson, 19 Id. 81.

The opinion of the court was delivered, February 13th 1873, by SHARSWOOD, J.—Upon a careful examination of the testimony I am unable to discover anything which varies the agreement in writing set forth as the ground of the bill. The evidence before the examiner was given without objection, and was entirely proper as explaining the relation between the parties, and the circumstances which led to the agreement. These facts are always admissible and may be considered in the construction of a written agreement. It appears that the verbal understanding originally was, that Herst was to have an interest of one-third in the premises, if purchased by Blaylock, but with his acquiescence that was changed, and the final arrangement was as expressed in the writing, that if Blaylock became the purchaser at the sheriff's sale, he was to hold the property in trust to sell and after paying encumbrances, to apply the proceeds to discharge the debts of the firm of P. Herst & Samuel, and to divide the surplus, if any, equally between Blaylock and Samuel. It is in evidence, and is not a matter in dispute, that all the debts of the firm of P. Herst & Samuel have been settled and paid, so that Herst has no longer any interest in the controversy. It clearly appears also, that Herst and Samuel had performed their part of the contract by procuring the consent of David Samuel to accept the bond and mortgage of Blaylock for his judgment. It is true that Blaylock did not covenant to become the purchaser, but it is equally true, that if he did purchase, he could not throw aside the obligations of the agreement by paying David Samuel in cash, instead of giving his bond and mortgage. If he bought he must hold the property upon the trust upon which he had agreed to hold it in that event.

The master reports that Blaylock was in fact the purchaser, though in the name of Zeigler, to whom he lent or furnished the money to pay for it, and we think that he is fully sustained in that finding by the evidence, for the reasons he has stated. The testimony of Blaylock and Zeigler themselves, with the circumstances as detailed by other witnesses, lead the mind to this conclusion, and overcome the answers. This being so, Zeigler's legal title is equally affected and bound by the trust. Blaylock had no right to substitute another person as trustee without the consent of Samuel. So much, therefore, of the decree below as declared the trust to exist and ordered Zeigler to execute a conveyance in fee to Blaylock to hold in trust, as expressed in the agreement, was certainly right. But we think it should have stopped there. There is no right or equity in Samuel to be paid one-half the net income. Until the sale takes place the rents are applicable in the first instance to the reimbursement of the amount advanced by Blaylock. When the sale takes place Blaylock must, of course, account for the rents. The bill does not pray for an account, nor for a sale, and the prayer that a conveyance should at once be

[Blaylock's Appeal.]

made to Samuel of a moiety of the property, subject to the amount of $10,800 paid by Blaylock and the prior encumbrances, is clearly inadmissible, because its effect would be to destroy the power of sale and abrogate the very agreement which is made the basis of the relief prayed in the bill.

The only equity which the complainant has upon the bill was to enforce the agreement by a decree that the legal title should be transferred.to and vested in the trustee named in it.

The decree below is reversed, and now it is ordered and decreed, that George W. Zeigler shall execute a conveyance in fee of the premises described in the bill to Lewis Blaylock, in trust, as expressed in the written agreement set forth in the bill, and that he be enjoined from conveying or encumbering said premises, and from executing any deed therefor other than is herein ordered; that the said trustee shall not sell the premises at private sale without the consent and approbation of the said Samuel in writing; nor at public sale without reasonable notice thereof beforehand, to be given to him, and that the parties to this appeal shall respectively pay their own costs.